IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Raquel Margarita Cocom, | ) | |
| | ) | No. 2:18-cv-002247 |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Andrey Timofeev and Irina Timofeev, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the court on Raquel Margarita Cocom's ("Mother") emergency ex parte motion for a temporary restraining order ("TRO") against her Child's father, Andrey Timofeev ("Father"), and grandmother, Irina Timofeev ("Grandmother"), as part of her efforts to have her child, V.A.T. ("Child") returned to her in Belize, ECF No. 8. For the reasons set forth below, the court **GRANTS** the motion.

## I.  BACKGROUND[1]

This matter arises from Mother's Petition under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22U.S.C. §§9001-11.  According to the Petition and TRO motion, Mother and Father met in Belize and were in a relationship from April 2009 until Father and Child left for the United States on November 5, 2017. Mother gave birth to Child on November 20, 2015 in Orange Walk District, Belize, after

---

[1] The allegations in Mother's Petition and in her TRO Motion are drawn from a number of sources, including Mother's application for assistance under the Convention, a police report from Belize, a Letter from the Director of the Belize Family Court, and Child's birth certificate, which have all been included as attachments on ECF.

1

which Mother raised the Child in Belize with some assistance from Father.  However, Father did not live full-time in the same house as Mother, Child, and Mother's ten-year-old child from a previous relationship, J.J.R.

Shortly after Child's birth, Father told Mother that he wished to move to the United States to join Grandmother and his stepfather.  Mother refused to agree to move to the United States unless the entire family, including J.J.R., moved together legally.  Eventually, Mother and Father agreed that they would obtain visas to migrate to the United States together, but Father then changed plans and applied only for a visa for himself and Child.  Unknown to Mother, Grandmother petitioned for Father to obtain a green card.  On November 5, 2017, Father told Mother that Grandmother had bought tickets for Father and Child to fly out of Belize later that day.  He assured Mother that he was only going to travel to South Carolina to visit his family for two weeks, after which he would return to Belize with Child, would marry Mother, adopt her son, and then they would all travel to the United States legally as a family.  Two weeks later when Child did not return home, Mother contacted Father and asked him to bring Child home to her immediately.  Father responded that Child would be staying in the United States.

Immediately afterwards, on November 20, 2017, Mother filed her Application under the Convention.  Belizean officials completed the application on or about January 26, 2018, after which it was transmitted to the United States Department of State.  Mother then obtained pro bono counsel to locate Child and to file this Petition.  Interpole in Washington, D.C. confirmed on June 26, 2018 that Child is now living with Father and/or Grandmother in Georgetown, South Carolina.  Mother's petition before this court, filed on August 14, 2018, alleges wrongful detention of Child, in violation of the Convention

and 22 U.S.C. §§ 9001, et seq. ECF No. 1. On August 14, 2018, Mother also filed an <u>ex parte</u> emergency motion for a TRO, requesting the following relief:

1. Issue an order prohibiting Father and Grandmother, or any others acting on their behalf or at their direction from removing the Child from the jurisdiction pending resolution of this action;
2. Issue an order taking into safe keeping the Child's, Father's, and Grandmother's travel documents, including their Belizean, Russian, and American passports;
3. Issue an expedited <u>ex parte</u> TRO requiring the appearance of Father, Grandmother, and the Child on the first date on the Court's calendar so the Court may combine the preliminary injunction hearing and hearing on the merits, holding any final hearing on the merits of the Verified Expedited Petition as soon as possible as required by the Convention; and
4. Order that Father and Grandmother shall response to the Verified Petition in writing within ten days of any hearing on the extension of the <u>ex parte</u> TRO so that this matter may be expedited as required by the convention.

For the reasons set forth below, the court grants in part and denies in part the motion.

## **II. STANDARD**

A party may move for a preliminary injunction or a TRO under Federal Rule of Civil Procedure 65. A Temporary Restraining order may be issued without notice to the adverse party or its attorney if:

> **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b). "The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a" longer period. <u>Id.</u> The movant must also give the court "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." <u>Id.</u>

3

A temporary restraining order or a preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); see also U.S. Dep't of Labor v. Wolf Run Mining Co., 452 F.3d 275, 281 n.1 (4th Cir. 2006). To obtain a TRO, a Plaintiff must show:

> (1) that she is likely to succeed on the merits,
> (2) that she is likely to suffer irreparable harm in the absence of preliminary relief,
> (3) that the balance of equities tips in her favor, and
> (4) that an injunction is in the public interest.

Winter, 555 U.S. at 20. A Plaintiff seeking injunctive relief must show that all four of the Winter factors support granting relief. See id.; see also Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (noting that the Plaintiff "bears the burden of establishing that each of these factors supports granting the injunction" (quoting Technical Publishing Co. v. Lebhar-Friedman, Inc., 729 F.2d 1136, 1139 (7th Cir. 1984))).

### III. DISCUSSION

The Hague Convention is intended "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Maxwell v. Maxwell, 588 F.3d 245, 250 (4th Cir. 2009). The Hague Convention seeks to preserve the status quo—the return of children to their home countries for further proceedings. Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001). Thus, it is not the underlying custody case at issue under the Hague Convention, but whether the treaty requires a child to be returned home for any custody proceedings. Id. at 398.

To accomplish the goal of maintaining the status quo, the court is empowered to take steps "to prevent future harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures." Hague Convention, art. 7(b); see also 22 U.S.C. § 9004(a) (allowing preventative measures "to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition."). Federal courts have used Article 7(b) and § 9004 to take provisional measures to ensure that abducted children are not removed from their jurisdiction during the litigation. See, e.g., Alcala v. Hernandez, 2014 WL 5506739, at *1 (D.S.C. Oct. 30, 2014), Hernandez v. Montes, 2018 WL 405977, at *1 (E.D.N.C. Jan. 12, 2018), Salguero v. Argueta, 2017 WL 1067758, at *2 (E.D.N.C. Mar. 21, 2017), Smith v. Smith, 2016 WL 4154938, at *3 (W.D.N.C. Aug. 4, 2016), Mauvais v. Herisse, 2013 WL 6383930 (D.Mass. Dec. 4, 2013) (prohibiting abductor from removing children from the jurisdiction during the pendency of the proceedings), Porter v. Gonzalez, No. 2009 WL 1809851 (M.D. Fla. June 24, 2009) (noting in a case arising under the Hague Convention that child's passport was ordered to be surrendered to the clerk of court and respondent was prohibited from removing minor child from the jurisdiction), Jenkins v. Jenkins, 2008 WL 483312 (S.D. Ohio Feb. 19, 2008) (ordering respondents to surrender passports and prohibiting them from leaving the jurisdiction of the court pending resolution of petition under the Hague Convention), Axford v. Axford, 2009 WL 2030755, at *5 (E.D. Pa. July 10, 2009) (entering a TRO ordering United States Marshals Service to seize any and all passports of respondents and of the minor child).

## A. The *Ex Parte* Nature of Mother's Request

Mother's request for relief was reviewed on an ex parte basis. Based on Mother's allegations and the findings below, the court finds that relief without notice to Father and Grandmother is necessary to avoid immediate and irreparable injury, loss, and/or damage if notice of the proceedings was given prior to this Order. As required by Rule 65(b)(1)(A), Mother's counsel has properly certified to the Court the reasons why notice should not be required. Thus, the elements of Rule 65(b)(1) are met.

## B. The Temporary Restraining Order

To obtain a TRO, a Plaintiff must show:

(1) that she is likely to succeed on the merits,
(2) that she is likely to suffer irreparable harm in the absence of preliminary relief,
(3) that the balance of equities tips in her favor, and
(4) that an injunction is in the public interest.

Winter, 555 U.S. at 20. An analysis of these factors establishes that provisional measures in the form of an ex parte TRO are authorized and necessary.

### 1. Likelihood of Mother's Success on the Merits

To succeed on a Petition for return of an abducted child under the Convention, the petitioner must prove by a preponderance of the evidence that: (1) the child was "habitually resident" in the petitioner's country of residence when the child was removed; (2) the removal breached petitioner's custody rights under the law of his or her home state; and (3) that the petitioner had been exercising his or her custody rights at the time of removal. Miller, 240 F.3d at 398 (citing Hague Convention, art. 3). Although there are several defenses under the Convention that a respondent might use to prevent the child's removal, none have yet been presented to the court.

Here, Mother has submitted to the court the Child's Belizean birth certificate, as well as a letter from the Director of the Belize Family Court, certifying that Mother is the "sole custodian/guardian of [V.A.T.]," and that the "Laws of Belize . . . state[] that the mother of any child born out of wedlock shall have and be entitled to the custody of the said child, until the child attains the age of eighteen years." ECF No. 1-5. Mother has also offered sworn testimony that the Child had habitually resided in Belize until the father removed Child when it was only two years old. While the Convention left "habitual residence" undefined, federal courts rely on a two-part test to determine habitual residence: (1) whether the parents shared a "settled intention" to abandon the former country of residence, and (2) whether there was an "actual change in geography" partnered with the "passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment." Maxwell, 588 F.3d at 251. All of the evidence presented by Mother to the court indicates that the parents did not share a "settled intention" that Child abandon Belize. Although there has been an "actual change in geography" between Belize and United States, Mother filed her Convention Application within weeks of Child leaving Belize, and there has likely not passed an "appreciable period of time" for this very young child to have acclimatized to the United States. Thus, the court finds that Mother has demonstrated that she will likely succeed on the merits of her petition.

**2. Likelihood of Mother's Irreparable Harm**

A parent's interest in raising their child is paramount, and any unlawful denial of that interest is a grave harm. Additionally "allowing [Father] to flee with [Child] is contrary to the very purpose of the Hague Convention and ICARA, and would result in

7

irreparable harm." Alcala, 2014 WL 5506739 at *6. Considering the allegation that Father has already wrongfully removed Child from Belize, there is a real risk that Father may leave this jurisdiction with Child. Thus, Mother has sufficiently demonstrated a likelihood of irreparable harm if the court does not grant the TRO.

### 3. Balance of Equities—Harm to Father

Father's harm will be minimal if the court grants the TRO. Mother is not requesting that the court grant Mother permanent custody. Rather, having presented compelling evidence that Child was wrongfully taken from Belize, Mother merely asks the court to prevent Father from leaving South Carolina with Child and order Father to appear at further proceedings that will allow the court to determine whether Child should be returned to Belize to allow the courts there to rule on custody. Because the court cannot make a custody determination, the court finds that Father or Grandmother cannot lose any custody rights from the TRO. See Abbot v. Abbot, 560 U.S. 1, 20 (2010) ("Ordering a return remedy does not alter the existing allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. It is the Convention's premise that courts in contracting states will make this determination in a responsible manner.") (citations omitted). Thus, the court finds that any threatened harm to Father and Grandmother is minimal as compared to the probability of irreparable harm to Mother or Child.

### 4. Public Interest

Finally, public policy supports issuance of the TRO here, as it is in the public's interest that the United States participate in the Convention to ensure the safe return of children to their home countries. See Alcala, 2014 WL 5506739, at *7 (D.S.C. Oct. 30,

2014) (citing ICARA's Congressional findings and concluding that "the public policy is not hindered, but is instead furthered, by the ordering of these provisional measures."); Salguero v. Argueta, 2017 WL 1067758 (E.D.N.C. March 21, 2017) ("Finally, a TRO serves the public interest. Since international abduction [and] wrongful retention of [a] child[ ] is harmful to [his or her] well-being,' a TRO in this case will serve the public interest by protecting the child's well-being.") (alterations in original).

### C. Rule 65(c) bond requirement.

In exercising its discretion, the court concludes that a bond is not required for the TRO to be issued. The requirement that the person requesting a TRO provide a security is not mandatory and can be waived. Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 n.3 (4th Cir. 1999); Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013). In similar actions under the Convention, other courts have waived the bond requirement. See, e.g., Hernandez v. Montes, 2018 WL 405977, at *2 (E.D.N.C. Jan. 12, 2018). Mother is merely seeking a temporary order prohibiting Father from removing Child from the jurisdiction, requiring Father to relinquish Child's travel documents to the custody of the court, and requiring an expedited hearing. Mother is not seeking a permanent custody order, nor is she seeking to permanently limit Father's ability to travel. Therefore, the court declines to require Mother to post a bond.

### IV. CONCLUSION

For the reasons set forth above, the court **GRANTS** the order. The court will conduct a combined hearing on the merits and, to the extend it is needed, a preliminary injunction hearing on Tuesday, August 28, 2018 at 2:00 PM at the J. Waties Waring

Judicial Center, 83 Meeting St., Charleston S.C. 29401. The court **ORDERS** the following:

1. Andrey Timofeev and Irina Timofeev, or any others acting on their behalf or at their direction shall not remove the Child from this court's jurisdiction pending the resolution of these proceedings. They shall not relocate the residence of the Child to another location in or out of South Carolina.

2. Respondents Andrey Timofeev and Irina Timofeev shall appear at hearing on August 28, 2018 at 2:00PM.

3. The United States Marshals Service is directed to immediately effect personal service of copies of the following documents on Respondents Andrey Timofeev and Irina Timofeev:
   a. This Order;
   b. The Verified Expedited Petition and its attachments (ECF No. 1); and
   c. Petitioner's ex parte motion and memorandum in support (ECF No. 8)

4. Respondents Andrey Timofeev and Irina Timofeev shall surrender any and all of their passports and the passports of the Child, T.A.V.—including their Belizean, Russian, and American passports—to the United States Marshals Service ("USMS") immediately upon service of the foregoing documents

5. The USMS is directed to seize any and all passports of respondents Andrey Timofeev and Irina Timofeev and of the Child, T.A.V., and deliver the passports to the Clerk of Court of the United States District Court of the District of South Carolina, Charleston Division. If the aforementioned individuals do not voluntarily provide the passports to the USMS upon its request, the USMS is authorized to use reasonable force to seize the passports. The USMS is authorized to enter private property, if necessary, to effect this seizure. The USMS is authorized to arrest and/or employ reasonable force against any individual who impedes or attempts to impede its seizure of the passports.

6. FAILURE OF RESPONDENTS ANDREY TIMOFEEV AND IRINA TIMOFEEV TO COMPLY WITH THIS ORDER WILL RESULT IN CONTEMPT PROCEEDINGS. See 18 U.S.C. § 401 (providing that a federal court "shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as ... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command").

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON
UNITED STATES DISTRICT JUDGE**

**August 17, 2018
Charleston, South Carolina**