# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Raquel Margarita Cocom, | ) | |
| | ) | No. 2:18-cv-002247 |
| Petitioner, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| Andrey Timofeev and Irina Timofeev, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

This matter comes before the court on Raquel Margarita Cocom's ("Cocom") verified petition (the "Petition") under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-11, against her child's father Andrey Timofeev ("Timofeev"), and Grandmother, Irina Timofeev ("Grandmother"), as part of her efforts to have her child minor child (the "Child") returned to her in Belize, ECF No. 8. The Court **GRANTS** the Petition and **ORDERS** the immediate return of the Child to Cocom in Belize. To this end, the court issues the following findings of fact and conclusions of law under Fed. R. Civ. P. 52.[1] The court also issues a separate return order covering the details of return and the extension of the preliminary injunction.

---

[1] To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

# I.  FINDINGS OF FACT

Based on the evidence presented at the trial in this matter, the court makes the following findings of fact:

1.  Cocom is a Belizean citizen who has lived in Belize all her life.  ECF No. 54, Proceedings 12/05/2018, Tr. 16:18–24.[2]  Timofeev is a Russian citizen who moved to Belize towards the end of 2008.  ECF No. 55, Proceedings 12/06/2018, Tr. 71:4–7.  At the time of Timofeev's relocation to Belize, Grandmother was already living in the United States as a lawful permanent resident.  She became a citizen in 2009.  ECF No. 55, Tr. 6:11–13.

2.  Cocom and Timofeev met in Belize in March 2009 and began a romantic relationship soon after.  ECF No. 55, Tr. 73:1–7.  The parties have presented conflicting evidence regarding whether they lived together and whether they had a common law marriage.  Because the court need not rely on these facts in order to decide this case, the court declines to make a factual finding regarding their living situation or marital status.

3.  While the parties dispute many of the aspects of their relationship, they both agree that Cocom and Timofeev are the biological parents of the Child, who was born in Belize in November 2015.  Pet.'s Ex. 2.  Until her travel to the United States with Timofeev in 2017, the Child's only residence was Belize.  ECF No. 55, Tr. 108:25–109:8.

---

[2] The court cites to the official transcripts of the proceedings, which were filed as sealed documents on ECF.  ECF Nos. 54 and 55.  The petitioner also requested that a version of the transcripts with her children's names and identifying information redacted be made available, which the court provided.  ECF Nos. 58 and 59.

4.     The Child is Cocom's second child.  ECF No. 54, Tr. 24:4–5.  Her first-born son, J.J.R., is currently ten years old.  Id.  J.J.R. is not the biological son of Timofeev and is not involved in these proceedings.

5.     Early in their relationship, Timofeev told Cocom of his intention to immigrate to the United States.  ECF No. 54, Tr. 25:11–21.  At trial he testified that moving to Belize was always part of his plan to immigrate to the United States, because it was an English-speaking country close to the United States.  ECF No. 55, Tr. 71:9–12. Cocom testified that, prior to the Child's birth, she had no problem with Timofeev immigrating to the United States, but that she intended to remain in Belize with J.J.R. and her family.  ECF No. 54, Tr. 25:11–21.

6.     Grandmother filed Form I-130 with the Department of Homeland Security ("DHS") on May 27, 2009, in which she petitioned for Timofeev to (1) receive a visa to travel to the United States as an unmarried adult son of a naturalized American citizen, and (2) become a lawful permanent resident.  ECF No. 55, Tr. 28:7–30:6; Pet.'s Ex. 15. Grandmother testified that she has also paid for the immigration process for Timofeev and the Child.  ECF No. 55, Tr. 15:20–24.  Timofeev testified that, at around the time of this initial filing, he considered himself in a common law marriage with Cocom, though the Child was not yet born.  ECF No. 55, Tr. 106:15–107:2.

7.     Shortly after the Child's birth in November 2015, Timofeev again mentioned his plan to immigrate to the United States.  ECF No. 54, Tr. 25:25–26:4. Cocom explained at trial that she had been open to this idea, but only if she, Timofeev, the Child, and J.J.R. all immigrated to the United States together as a family.  Id.

8.      Around the same time as this conversation, Timofeev completed an online Form DS-260 that he electronically signed and filed with DHS on May 9, 2016.  Pet.'s Ex. 14.  Cocom testified that she did not know that Timofeev had been filing any of these immigration papers.  ECF No. 54, Tr. 67:5–6; 69:15–17; 91:6–11.

9.      After Timofeev e-filed his Form DS-260, Grandmother filed Form I-864 with DHS affirming that she was sponsoring Timofeev to become a lawful permanent resident.  Pet.'s Ex. 12.  This time, however, Grandmother included the Child on the immigration form as an immediate family member of Timofeev, who was the principal immigrant she would be sponsoring.  Id.  The Child was a derivative beneficiary eligible to receive a visa to travel to the United States to become a lawful permanent resident.  ECF No. 55, Tr. 32:2–33:5.  Around the same time, Timofeev also had completed the Form DS-260 online for the Child.  Pet.'s Ex. 13.

10.      Cocom testified that she did not know that Timofeev had started the process for the Child to receive a green card.  ECF No. 54, Tr. 30:20–22; 49:1–10; 67:5–6; 69:15–17; 91:6–11.  She claims she did not know about this process until Timofeev and the Child were already in the United States.  ECF No. 54, Tr. 30:23–31:2.

11.      In July 2016, the Child was examined by a doctor as part of the paperwork for her immigration to the United States.  As Cocom's expert explained, medical exams are a part of the immigration process.  ECF No. 55, Tr. 38:15–23.  The immigrant-applicants go to certain pre-qualified local doctors who complete the medical forms.  ECF No. 55, Tr. 38:24–39:14.  The completed forms are then generally returned directly to the local consulate by the examining physician, or are placed in a sealed envelope to be returned to the consulate by the petitioning immigrant.  Id.

4

12.     The parties contest the facts surrounding this doctor's exam.  Cocom testified that on July 6, 2017, Timofeev called her and asked her to bring the Child to Belize City.  ECF No. 54, Tr. 62:3–21.  When she arrived, she did not have the Child's "clinical card" with her, which lists all the Child's immunizations and other medical information.  Id., Pet.'s Ex. 3.  Timofeev then instructed Cocom to return home, obtain the clinical card, and return to Belize City.  ECF No. 54, Tr. 62:3–21.  During the doctor's exam, Cocom testified that she questioned the doctor regarding the Child's shots because the Child already had an appointment scheduled for October of that year to receive her vaccinations.  Id.  The doctor responded that the Child would be in the United States at that time.  Id.  Cocom claims that she asked Timofeev to explain what the doctor meant after the exam finished.  Id.  She says that Timofeev explained that the Child was getting shots that the government of Belize could not afford to give to all Belizeans.  Id.

13.     Timofeev testified that his and the Child's medical evaluations occurred on the same day.  ECF No. 55, Tr. 87:3–4.  Timofeev testified that, after the medical examination, the doctor spoke with him and Cocom.  ECF No. 55, Tr. 87:7–10.  Timofeev testified that, at that appointment, he "explained we are applying for, permanent residence for me, my child . . ."  ECF No. 55, Tr. 87:10–11.

14.     The medical forms from this visit provided to the parties by DHS were signed by Timofeev, but not by Cocom.  Id.  The clinical card referenced by Timofeev in her testimony does not show a July 5, 2017 medical visit.  Pet.'s Ex. 3.  Instead, it shows on page three that the Child received additional vaccinations on July 6, 2017.  Though the treating physician, Dr. Teresita, Mendez appears to have stamped both documents with the same stamp, neither party called the treating physician as a witness.  No other

evidence in the record explains what occurred during this medical appointment, so the Court is left only with the parties' competing accounts.

15.     In addition to the medical evaluation, Timofeev was required to complete an interview at the American Consulate in Belize to immigrate to the United States.  As Cocom's expert explained at trial, while the interview can be long and detailed, most immigrants under the family-based immigration system have a "DMV experience" where the immigrant appears at a window and answers a handful of questions under oath in several minutes.  ECF No. 55, Tr. 40:12–41:24.  While the immigrant-applicant must appear for the interview, children under fourteen are not required to appear.  ECF No. 55, Tr. 58:3–10.  This would mean that neither the Child, who was two years old at the time, nor Cocom's son, who was only about nine years old, likely would have been required to appear at the consulate to complete the visa process.  Additionally, Cocom's expert explained that only those with an appointment notice can appear and enter the consulate and that consulates are "very strict about appointment notices."  ECF No. 55, Tr. 58:11–59:15.  However, the expert admitted that he was not familiar with and could not testify regarding the interview process at the American Consulate in Belize.

16.     The parties' accounts of the visa interview also diverge.  Timofeev testified that his interview was ultimately scheduled for June 2017 at the American Consulate in Belize City, Belize.  ECF No. 55, Tr. 87:23–88:1.  He testified that he had received an appointment letter that listed his and the Child's names.  ECF No. 55, Tr. 88:1–12.  Timofeev explained that he went to the consulate with the Child and Cocom, but that Cocom stayed outside of the security checkpoint with his laptop.  ECF No. 55, Tr. 113:7–15.  Cocom did not enter the consulate at that time.  ECF No. 55, Tr. 88:7–12.  Timofeev

testified that Cocom eventually entered the consulate and was present for a portion of the interview, which was conducted in front of a window. ECF No. 55, Tr. 89:1–22. Timofeev claims that the interviewer explained that only Timofeev and the Child would be travelling to the United States and that Cocom might not see the Child for several years. ECF No. 55, Tr. 90:14–91:3.

17.    By contrast, Cocom testified that she was at the United States Embassy in Belize on July 11, 2017, but was not formally interviewed or put under oath. ECF No. 54, Tr. 59:9–60: 61:9–12; 24; 68:5–8. She claimed that Timofeev was the only one to answer any questions that were asked. ECF No. 54, Tr. 60:17–24; 61:13–24; 66:14–15. She testified that she never gave consent to an embassy official for the Child to travel to the United States permanently, and that she did not raise any objections while at the embassy because of Timofeev's bad temperament and her lack of understanding of the process. ECF No. 54, Tr. 66:6–15; 67:3–16; 69:6–18. Additionally, Cocom testified that Timofeev explained to the official at the consulate that Cocom would be travelling to the United States on a tourist visa, leading her to believe that the whole family would be getting tourist visas. ECF No. 54, Tr. 60:6–61:8.

18.    The immigration paperwork received by the parties from the State Department and DHS and provided to the Court as exhibits does not contain any interview appointment letter. ECF No. 55, Tr. 112:14–113:6. Likewise, the Court record does not contain any documentation about the visa interview to corroborate either side's version of events. Further, the physical documentation that the court does possess— namely the Child's medical records and the immigration application forms submitted by Timofeev and Grandmother—did not require Cocom's signature or otherwise indicate

that she must have given her approval for them to be submitted and for the Child to obtain a visa.

19.     Following the completion of the immigration process, Timofeev and the Child received visas to travel to the United States and to become lawful permanent residents.  ECF No. 55, Tr. 48:9–13; Pet.'s Ex. 19.  Cocom testified that she was not aware of this, instead thinking that they had received tourist visas.  ECF No. 54, Tr. 49:11–16.  Cocom's immigration law expert explained the differences between tourist and immigration visas.  ECF No. 55, Tr. 54:7–55:18.  Generally speaking, the type of immigrant visa received by Timofeev and the Child is used to permanently relocate to the United States.  Id.  Conversely, a non-immigrant, "tourist," or "B" visa that Cocom thought the family would receive is usually for a six-month visit and "comes with this implicit promise that at the end of that six months, you're going to return [to your home country]."  Id.

20.     Timofeev testified that his and the Child's visas for permanent residency status were approved in mid-October 2017, and that he informed Cocom of this immediately.  ECF No. 55, 92:6–22.  Cocom testified that she was not made aware of the permanent residency visas and was rather told on November 4, 2017 that Timofeev and the Child would be departing for a two week visit the following day.

21.     On November 4, 2017, Grandmother purchased tickets for Timofeev and the Child to fly from Belize to Miami the following day.  ECF No. 55, Tr. 17:13–19; 113:22–114:1.  The parties testified when they arrived at the airport the next day, November 5, 2017, the Belizean immigration authorities required a signed document from Cocom authorizing the Child to fly out of the country.  ECF No. 55, Tr. 118:1–10.

The document was drafted and signed at the airport shortly before the flight.  Id.  The document authorizes Timofeev to take the Child out of Belize, but is silent as to the length of the trip or the scope of the authorization.  Resp. Ex. 8.[3]  Cocom testified that neither she nor Timofeev wrote the form, but that it was provided to them at the airport.

22.     Cocom testified throughout the trial that she and Timofeev had agreed that Timofeev would take the Child to the United States for two weeks to visit Grandmother and would then return home.  By contrast, Timofeev claimed that the plan at the time of his departure was that he and the Child would travel to the United States and then petition to bring Cocom and her son, J.J.R., into the United States legally.  ECF No. 55, Tr. 14:4; 100:21–101:1; 114:12–115:1 117:21–25.

23.     Timofeev and the Child arrived in Miami on November 5, 2017, and presented themselves to Customs and Border Protection for admission into the country.  Pet.'s Exs. 6–7.  Cocom's immigration expert testified that travellers entering the United States with children are not required to present any parental consent documentation—a child's passport and visa will suffice.  ECF No. 55, Tr. 47:11–23.  At that point, Timofeev and the Child became lawful permanent residents, and several weeks later they received their permanent resident cards ("green cards") in the mail.  ECF No. 55, Tr. 45:15–22.

---

[3] Timofeev offered this document as an exhibit at trial; however, Cocom objected to the introduction of the exhibit because Timofeev had failed to provide a copy to her counsel prior to trial as required by the Court's Scheduling Order.  ECF No. 41; ECF No. 55, Tr. 7:24–8:5; 98:7–15.  As a result, the Court did not admit the exhibit into evidence, though testimony as to its contents is in the record, subject to Cocom's objection.  ECF No. 55, Tr. 98:20–99:18.

24.     After arriving in the United States, Cocom would routinely speak with Timofeev and the Child over the phone. ECF No. 55, Tr. 115:21–116:11. After a brief stay in Marion County, South Carolina, the Child began living with Timofeev and Grandmother in Georgetown County, South Carolina, where she currently lives. ECF No. 55, Tr. 17:20–21.

25.     Cocom testified that upon learning that Timofeev would not be returning with the Child two weeks after the child departed Belize, she visited INTERPOL in Belize to request information about the location of Timofeev and the Child. ECF No. 54, Tr. 33:14–34:11; Pet.'s Ex. 9. She did so on November 21, 2017, shortly after the alleged fourteen-day return deadline passed on November 19, 2018. ECF No. 54, Tr. 34:4–6. She also visited a governmental agency, Human Development, which serves as the Belizean Central Authority under the Hague Convection. ECF No. 54, Tr. 34:12–16; Pet.'s Ex. 11. At that time, she applied for return of the Child under the Hague Convention. ECF No. 54, Tr. 34:12–24; Pet.'s Ex. 11. Though Cocom's Hague Convention application is dated January 26, 2018, Pet.'s Ex. 11, Cocom testified that she was required to return to the Belizean Central to provide additional information and sign the application, Tr. 54, 34:25–35:6. Cocom attributes this later signature to processing delays by the governmental agency. Id.[4]

---

[4] Because she properly filed her Hague Convention Petition within one-year of the Child's abduction such that the "well-settled" exception of Article 12 does not apply, any delay in filing the application is immaterial. See Katona v. Kovacs, 148 F. App'x 158, 161 (4th Cir. 2005) ("[W]e have found no cases that reduce the time frame in which a parent must act under the Convention. Indeed, to do so appears to directly conflict with the intent of the Convention's drafters who adopted a one-year limitation.").

26.     The next day, November 22, 2017, Cocom visited the Orange Walk Police Department and filed a police report.  ECF No. 54, Tr. 35:7–24; Pet.'s Ex. 8.  In that police report, she stated that the parties had an agreement for the Child to return from the United States after two weeks, but that Timofeev violated the agreement by failing to return the Child to Belize.  Pet.'s Ex. 8.

27.     Cocom also testified that during this time she continued to ask Timofeev to return the Child to Belize.  She testified that when she would ask Timofeev to return the Child, she would remind him that they had a verbal agreement that the Child would only be gone from Belize for two weeks.  ECF No. 36, Tr. 36:10–13.  At trial, Cocom played a voice recording that Cocom had made of a telephone conversation between her and Timofeev, in which she can be heard telling him that he had agreed to return with her daughter in two weeks, and she wanted to bring him home.  Cocom relies on that recording to support her argument that Timofeev had agreed to return the child in two weeks.  However, the court was unable to discern all of Timofeev's answers during that phone call.  At most, the court heard Timofeev state that "I do not come back" and "I do not just send anything until she gets these papers."  ECF No. 54, Tr. 43:14–17.  Thus, the court declines to rely on this recording as conclusive evidence that Timofeev had in fact agreed to only be gone with the child for two weeks.

28.     Belizean officials completed the application for the Petition on or about January 26, 2018, after which it was transmitted to the United States Department of State.  Cocom then obtained pro bono counsel in the United States to locate the Child and to file the Petition.  INTERPOL in Washington, D.C. confirmed on June 26, 2018 that the Child is now living with Timofeev and Grandmother in Georgetown, South Carolina.  Cocom's

petition before this court, filed on August 14, 2018, alleges wrongful detention of the Child, in violation of the Convention and ICARA. ECF No. 1.

29.     On August 14, 2018, Cocom also filed an ex parte emergency motion for a temporary restraining order, requesting that the court order Timofeev and Grandmother to surrender their passports to the court and to not remove the Child from South Carolina. On August 17, 2018, the court granted in part and denied in part the motion. ECF No. 15. The order was served upon defendants on August 20, 2018, the same day that the U.S. Marshal's service confiscated the passports of Timofeev, Grandmother, and the Child. On August 28, 2018, the court held a hearing at which counsel for petitioner and respondent Timofeev were present. The court ordered that the terms of the TRO be issued as a preliminary injunction.

30.     The court held a trial on the merits of this case on December 5–6, 2018.

## II.   CONVENTION AND APPLICABLE U.S. LAW

Cocom's Petition alleges that Timofeev wrongfully retained the Child, in violation of the Convention and ICARA.

The relevant portions of the Convention, with emphasis added, are as follows:

Article 7

Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.

In particular, either directly or through any intermediary, they shall take all appropriate measures —

a to discover the whereabouts of a child who has been wrongfully removed or retained;

b to prevent further harm to the Child or prejudice to interested parties by taking or causing to be taken provisional measures;

c to secure the voluntary return of the Child or to bring about an amicable resolution of the issues;

f to initiate or facilitate the institution of judicial or administrative proceedings with a <u>view to obtaining the return of the Child</u> and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

g where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

## Article 11

The judicial or administrative authorities of Contracting States shall act <u>expeditiously in proceedings for the return of children.</u>

If the judicial or administrative authority concerned has not reached a decision <u>within six weeks</u> from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. . . .

## Article 12

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the Child is<u>, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the Child forthwith.</u> The judicial or administrative authority

Where the judicial or administrative authority in the requested State has reason to believe that the Child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the Child.

## Article 13

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State <u>is not bound to order the return of the Child if the person, institution or other body which opposes its return establishes that —</u>

a <u>the person, institution or other body having the care of the person of the Child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention</u>; or

b <u>there is a grave risk that his or her return would expose the Child to physical or psychological harm or otherwise place the Child in an intolerable</u> situation.

The judicial or administrative authority may also refuse to order the return of the Child if it finds that the Child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the Child provided by the Central Authority or other competent authority of the Child's habitual residence.

Article 20

The return of the Child under the provisions of Article 12 may be refused if this <u>would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.</u>

Hague Conference on Private Int'l Law, 19 I.L.M. 1501, 1502 (1980).

The relevant portions of United States law that codified the Convention, with

emphasis added, are as follows:

22 USC § 9003. Judicial remedies

(a) Jurisdiction of courts. The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.

(b) Petitions. Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the Child is located at the time the petition is filed.

(**c**) Notice. Notice of an action brought under subsection (b) of this section shall be given in accordance with the applicable law governing notice in interstate child custody proceedings.

(d) Determination of case. The court in which an action is brought under subsection (b) of this section shall decide the case in accordance with the Convention.

(e) Burdens of proof

(**1**) A <u>petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence--</u>

(**A**) <u>in the case of an action for the return of a child, that the Child has been wrongfully removed or retained within the meaning of the Convention;</u> and

(**B**) in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

(**2**) <u>In the case of an action for the return of a child, a respondent who opposes the return of the Child has the burden of establishing--</u>

14

**(A)** by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and
**(B)** by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

22 U.S.C. § 9004. Provisional remedies
(a) Authority of courts. In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 9003(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the Child involved or to prevent the Child's further removal or concealment before the final disposition of the petition.
(b) Limitation on authority. No court exercising jurisdiction of an action brought under section 9003(b) of this title may, under subsection (a) of this section, order a child removed from a person having physical control of the Child unless the applicable requirements of State law are satisfied.

22 U.S.C. §§9003–9004.

### III.  DISCUSSION

The Convention[5] is intended "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence."  Maxwell v. Maxwell, 588 F.3d 245, 250 (4th Cir. 2009).  The Convention seeks to preserve the status quo—the return of children to their home countries for further proceedings—when appropriate.  Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001).  Thus, it is not the underlying custody case at issue that is being decided under the Convention; rather, a court adjudicating a petition under the Convention must determine whether the Child should be returned home for

---

[5] Both the United States and Belize are parties to the Hague Convention.  The United States became a party when it ratified the Hague Convention in 1988.  See Convention, art. 37.  Belize became a party through accession.  Id. art. 38. The United States accepted Belize's accession, and the Hague Convention entered into force between the two countries in 1989.  See Hague Conference on Private Int'l Law, Acceptance of Accession, http://www.hcch.net/ (last visited Dec. 15, 2018).

custody proceedings.  Id. at 398.  To succeed on a petition for return of a child under the Convention, the petitioner must prove by a preponderance of the evidence that: (1) the Child habitually resided in the petitioner's country of residence when the Child was removed; (2) the removal breached petitioner's rights of custody under the law of his or her home state; and (3) that the petitioner had been exercising his or her rights of custody at the time of removal.  Miller, 240 F.3d at 398 (citing the Convention, art. 3).  Even if a petitioner proves her prima facie case, the respondent might still prevent the removal of the Child by asserting certain affirmative defenses—namely, that the petitioner consented to the Child's removal.  The court considers each element in turn.

**A.  Cocom's Prima Facie Case**

**1.  Child's Habitual Residence in Belize**

To secure the return of the Child to Belize, Cocom must first demonstrate that Belize was the country of the Child's habitual residence before the she was removed to the United States.  "The framers of the Hague Convention intentionally left 'habitual residence' undefined, and intended that the term be defined by the unique facts in each case." Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009).  Under the two-part framework developed by federal courts to determine the Child's habitual residence, the court must consider: (1) "whether the parents shared a settled intention to abandon the former country of residence"; and (2) "whether there was an actual change in geography coupled with the passage of an appreciable period of time, one sufficient for acclimatization by children to the new environment."  Id. (internal quotations omitted).

**a.  Parent's Shared Intent**

"Focusing on intentions gives contour to the objective, factual circumstances surrounding the Child's presence in a given location" and whether this presence "is intended to be temporary rather than permanent." Gitter v. Gitter, 396 F.3d 124, 132 (2d Cir. 2005). "The Ninth Circuit's opinion in Mozes v. Mozes has served as a guide for federal courts in determining parental intentions in Hague Convention cases." Maxwell, 588 F.3d at 251.[6] In Mozes, the Ninth Circuit established three broad categories of factual scenarios. The first is "where the court finds that the family as a unit has manifested a settled purposed to change habitual residence, despite the fact that one parent may have had qualms about the move." Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir. 2001). This includes those situations where "both parents and the Child translocate together under circumstances suggesting that they intend to make their home in the new country." Id. The Ninth Circuit found that when a court determines "that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." Id. The second category of cases includes those "where the child's initial translocation from an established habitual residence was clearly intended to be of a specific delimited period," in which cases court have "generally refused to find that the changed intentions

---

[6] In Maxwell, the Australian father filed a petition under the Convention after the mother took their children back to her home in the United States. The father claimed that the parents had a shared intent that the children would permanently relocate to Australia. The Fourth Circuit found that the children's habitual residence was still the United States, due to the fact that the mother sought permission from the children's school in the United States to allow them to be absent for a portion of the spring semester but then to return to school in March, and that she had maintained her car insurance in the United States. Maxwell at 253.

of one parent led to an alteration in the child's habitual residence." Id.  Category three falls in between these two, and involves those situations were "the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." Id. Cases that fall into the third category are highly fact-dependent.  "Following Mozes, another category of cases developed . . . [those] where courts have refused to find a change in habitual residence because one parent intended to move to the new country of residence on a trial or conditional basis." Maxwell at 251.  Courts have considered the following factors as evidence of parental intent:

> Parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possession; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence."

> Id. at 252.

This case clearly does not fall under the first category of intent, as both parents did not "translocate" with the Child, which could evidence a settled intention to establish their home elsewhere.  Depending on which parent's narrative the court believes, this situation either falls into the second or fourth category—that Cocom agreed to allow the Child to leave Belize for a delineated amount of time, or that Cocom agreed that the Child could move to the United States on a conditional basis.  This determination of whether Cocom intended that the Child leave Belize to reside permanently in the United States requires the court to conduct the same analysis as it would to determine whether Timofeev has proven that Cocom consented to the Child's removal, which is one of the Convention's affirmative defenses that he has raised.  Thus, the court addresses in totality

the question of whether Cocom intended that the Child relocate permanently to the United States, or consented to such a move, at the conclusion of this order during its analysis of Timofeev's potential affirmative defenses. The court next considers the remaining elements of Cocom's prima facie case and finds that she has proven these elements by a preponderance of the evidence.

### b. Change in Geography and Acclimatization

If the court finds that the parents did share an intent that the Child be moved to the United States, it must then consider whether the Child has actually acclimatized to a new location. Here, the Child has clearly changed geography. In considering "acclimatization," the court should not be looking to see "simply whether the Child's life in the new country shows some minimal degree of settled purpose," but should instead consider whether the "child's relative attachments to the countries have changed to the point where [ordering the Child's return] would now be tantamount to taking the Child out of the family and social environment in which its life has developed." Mozes, 239 F.3d at 1081. "Federal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the Child's age to determine the extent of a child's acclimatization to the new country of residence." Maxwell, 588 F.3d at 254.

The parties have not submitted much evidence regarding the extent to which the Child has acclimated to life in the United States. The Child has resided in the United States for about one year, which is roughly one-third of her short life. However, she has only been here for an entire year because it took over six months for her case to be processed through the correct international and United States government channels, and

another five months for it to be fully heard and decided upon by this court, even though Cocom initiated the process to secure the Child's return only two weeks after the Child's departure. Additionally, the court notes that due to the Child's young age, she has yet to enroll in school or build any sort of social life in this country independent of Timofeev and Grandmother. Thus, although the Child has changed geography, the court finds that the Child has not acclimatized to life in the United States to such an extent that returning the Child to Belize would be improper under the Convention.

### 2. Wrongful Removal in Violation of Cocom's Rights of Custody

The next element of Cocom's prima facie case requires that she demonstrate that the Child's removal violated her rights of custody. The court finds that she has sufficiently proven this element. Article 3 of the Convention considers removal of the Child to be wrongful where "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the Child was habitually resident immediately before the removal or retention." Convention, 19 I.L.M. at Art. 3(a). Article 5 defines "rights of custody"[7] as including "rights relating to the care of the person of the Child and, in particular, the right to determine the Child's place of residence." Id. Art. 5(a). "[R]ights of custody for purposes of Article 3 of the Convention means rights of custody at the time of removal." White v. White, 718 F.3d 300, 307 (4th Cir. 2013). Courts should rely on the law of the state in which the Child was habitually resident to determine whether the

---

[7]     Courts have consistently found that the term "Rights of Custody" under the Convention does not mean the same thing as the legal "Custodial Rights" over a child that might be awarded by a local family court. See Abbott v. Abbott, 560 U.S. 1, 20 (2010) ("Ordering a return remedy does not alter the existing allocation of custody rights [ ] but does allow the courts of the home country to decide what is in the Child's best interests.").

petitioner possessed rights of custody at the time of the Child's removal. See Bader v. Kramer, 445 F.3d 346, 349–50 (4th Cir. 2006) (applying German law to determine whether petitioner had rights of custody over the German child). Under Belizean law, biological parents have "rights relating to the care of the person of the Child." See Convention, art. 5(a). Specifically, Belizean family law mandates that "[e]very parent shall have parental responsibility for his [or her] child." Belize Families and Children Act Ch. 173, Rev. Statutes of Belize 2011, § 6(1).

There is no dispute that Cocom is the Child's biological mother, as she is listed on the Child's birth certificate. The Child was residing under Cocom's care in Belize until she left for the United States. Tr. 54:24–55:10, 93:23–94:4, 109:12–23. Most importantly, Timofeev conceded at trial that Cocom had rights of custody over the Child, although he maintained for the record his position that Cocom did not have sole custodial rights. Thus, the court finds that Cocom had rights of custody under the Convention at the time when the Child was removed to the United States, and has thus proven the second element of her prima facie case.

### 3. Cocom Exercising Custodial Rights

Lastly, Cocom must establish by a preponderance of the evidence that she was exercising her rights of custody at the time the Child was removed from Belize. Convention, art. 3. Cocom presented sufficient evidence at trial to allow the court to conclude that she was caring for the Child, who was living with her, at the time that the Child was removed from Belize.

### B. Timofeev's Affirmative Defenses

21

Even if the court finds that Cocom successfully proved her prima facie case, the court might still choose not to return to child to Belize if Timofeev can assert one of the enumerated affirmative defenses to removal.  ICARA, the United States law that codified the Convention, provides that:

> (2) In the case of an action for the return of a child, a respondent who opposes the return of the Child has the burden of establishing--
> (A) by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and
> (B) by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

22 U.S.C § 9003.

Article 13(b) of the Convention provides for the respondent to establish that "there is a grave risk that [the Child's] return would expose the Child to physical or psychological harm or otherwise place the Child in an intolerable situation."  Article 20 states that the "return of the Child [ ] may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  Timofeev has not put forth any facts or arguments regarding either of these affirmative defenses.  The other exception in Article 13 is that the court may refuse to remove the Child if the respondent establishes that "the person [ ] having care of the Child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention."  The court has addressed the "exercise of custody rights" issues above.  Thus, the court must consider whether Cocom consented or acquiesced to the Child's removal.

## 1.  Consent or Acquiescence

Neither the Hague Convention nor its implementing statute, ICARA, define consent or acquiescence.  Padilla v. Troxell, 850 F.3d 168, 175 (4th Cir. 2017).  Yet the Fourth Circuit has found that "[c]onsent and acquiescence are two separate and analytically distinct affirmative defenses."  Id. (internal quotations omitted).  "Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention."  Id.

The Third Circuit has noted that,

> [o]ften, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent. In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the Child to travel outside its home country. . . . The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.

Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  Indeed, "many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the Child's return."  Fabri v. Pritikin-Fabri, 221 F.Supp.2d 859, 871 (N.D. Ill. 2001).

The evidence at trial clearly demonstrated that Cocom did not acquiesce to the Child's permanent retention in the United States after Timofeev and the Child arrived here.  She testified that she continually asserted to Timofeev that she wanted him to return the Child to Belize, which was confirmed by her recordings of their phone

conversations and the fact that she initiated this action two weeks after her child's departure.

Regarding whether Cocom had consented to the Child's permanent relocation to the United States before she departed Belize, Cocom testified that her agreement with Timofeev regarding where the Child and the whole family would reside shifted with time. She claims that she and Timofeev first agreed that they would obtain visas to immigrate to the United States together, but that Timofeev then changed plans and only applied for a visa for himself and the Child without informing her. She claims that Timofeev first told her on November 4, 2017 that Grandmother had bought tickets for him and the Child to fly out of Belize the very next day. At this point, according to Cocom, the parents no longer had a shared intention that the Child would permanently relocate to the United States. Rather, as Cocom testified, the parents agreed that Timofeev would only travel to South Carolina with the Child for two weeks to visit his family, after which Timofeev would return with the Child.

By contrast, Timofeev testified that the plan was always for him and the Child to come to the United States first, obtain green cards, and then apply to have Cocom and J.R.R. join them in the United States. He testified that Cocom was fully aware of this plan when he and the Child left Belize. Timofeev testified that he and Cocom had expected that he and the Child would receive their green cards about two weeks after arriving in the United States, at which point they would be able to begin the process to bring over Cocom and her son. At the trial, Timofeev explained that this must be the basis for Cocom's "two week" theory, implying that she had agreed to the plan until it took more than two weeks for him and the Child to receive their green cards, at which

24

point she abandoned the original plan and initiated proceedings to ensure the return of the Child. The operative fact in this case is that Timofeev has not proceeded with the immigration process for Cocom and J.R.R to move to the United States, even though he received his green card one year ago in December 2017. According to his narrative, this promise to pursue immigration status on behalf of Cocom and her son was part of the original plan. Yet at trial, Timofeev testified that he has since abandoned that plan because Cocom initiated this proceeding against him. ECF No. 55, Tr. 116:20–118:19.

The physical evidence admitted at trial does not conclusively support one narrative over the other, and the court finds both stories to be plausible. Determining intent/consent here ultimately requires choosing between the parties' competing testimonies. Normally, when faced with a situation like this—where the physical evidence does not conclusively prove the parties' intent and the court must rely solely on competing plausible testimonies—the court would turn to the burden of proof to choose between the different narratives. In other words, if a petitioner bears the burden to prove her case by the preponderance of the evidence and fails to put forth evidence outside of her own testimony that convinces the court that it should believe her testimony over that of the respondent, then the court will usually find that the petitioner has failed to prove her case by the preponderance of the evidence. Cocom bears the burden to prove by a preponderance of the evidence that she and Timofeev had not shared a settled intention that the Child relocate permanently to the United States. On the other hand, Timofeev bears the burden to prove by a preponderance of the evidence that Cocom consented to the Child's removal in order successfully assert "consent" as an affirmative defense.

As far as the court can tell, it must engage in roughly the same analysis to determine intent under the petitioner's prima facie case as it would to determine consent under the respondent's affirmative defense, except that these analyses are purportedly supposed to be conducted under different burdens of proof. The pertinent case law, while providing substantial guidance on determining a parent's intent and determining whether a parent provided consent, has not clarified how and when the burden shifts from the petitioner to the respondent to prove this intent/consent issue. However, the court need not reach a conclusion regarding Cocom's intent/consent because, even if the court relied on Timofeev's version of events, the court would still order the return of the Child due to Timofeev's violation of the conditions of Cocom's consent. Thus, the court declines to make determinative findings on: (1) whether Cocom proved that she did not intend for the Child to relocate permanently to the United States, or (2) whether Timofeev proved that Cocom consented to the Child's relocation.

### 2. Condition of Alleged Consent was Violated

When considering whether a petitioner consented to the Child's removal, the court must "evaluate what the petitioner contemplated and agreed to, as well as the nature and scope of consent, including any conditions or limitations." Padilla v. Troxell, 850 F.3d 168, 176 (4th Cir. 2017); see also Darin v. Olivero-Huffman, 746 F.3d 1, 15 (1st Cir. 2014) ("What the petitioner actually contemplated and agreed to, as well as the nature and scope of the petitioner's consent—including any conditions or limitations— should be taken into account."). "The inquiry does not necessarily end with the petitioner's consent to the Child's removal, [and if] the petitioner agrees to a removal under certain conditions or circumstances and contends those conditions have been

breached, the court must [ ] examine any wrongful retention claim." <u>Baxter v. Baxter</u>, 423 F.3d 363, 371 (3d Cir. 2005). Additionally, "the court retains the discretion to order return even if one of the [petitioner's affirmative defenses] is proven." Convention, art. 18; <u>see</u> <u>Feder v. Evans-Feder</u>, 63 F.3d 217, 226 (3d Cir. 1995) ("We note that the exceptions are narrowly drawn, lest their application undermines the express purposes of the Convention. Indeed, the courts retain the discretion to order return even if one of the exceptions is proven.").

Here, if Timofeev and Cocom had agreed that he and the Child would relocate to the United States first and that Timofeev would then petition for Cocom and J.R.R. to immigrate to the United States, as Timofeev claims, then Cocom's consent to allow the Child to move to the United States was conditional on Timofeev subsequently pursuing the immigration proceedings for Cocom and J.R.R. This condition was not met; as such, the consent, if it ever did exist, has been invalidated.

Timofeev testified that he had moved to Belize with the intent to eventually immigrate to the United States, and that he initially applied for a visa before developing a serious romantic relationship with Cocom. Thus, when Timofeev applied, he used a particular form, which differed from the one that he would have used if he was applying as a married person on behalf of himself, his wife, and his child. Tr. 32:16–33:6. If he had married Cocom "while he was awaiting the availability of a visa, he would have needed to notify the [ ] Department of State, and they would re-cateogrize him." Tr. 33:13–16. Specifically, had he tried to file an application on behalf of himself, Cocom, the Child, and J.R.R., he would have been transferred from the F1 Visa category to the F3 visa category, which has an additional wait time of four to five years. Tr. 33:19–21.

Timofeev did not do this; rather, he chose to add only the Child as a dependent to his pending application.  Timofeev also testified that he believed it would be easier for him to file visa applications for Cocom and J.R.R. once he and the Child had received their green cards.   Based on the complicated nature of Timofeev's visa application, the court finds it reasonable to believe that he and Cocom had decided that Timofeev and the Child would travel to the United States first when their visas were approved, and that Cocom and her son would apply to come to the United States after Timofeev and the Child received their green cards.

It has been over a year since Timofeev and the Child moved to the United States, and Timofeev has not fulfilled his alleged promise to help Cocom and her son immigrate to the United States, even though Cocom's consent was conditional upon her ability to be reunited with her daughter in the United States.  Timofeev claims that he had always planned to bring over Cocom and J.R.R., but that he changed his mind when she initiated these proceedings against him in November 2017.  While the court understands that Timofeev might have been upset that Cocom initiated legal proceedings against him, the court finds that, given the high stakes of this situation, Timofeev's response to Cocom's actions was unreasonable and inexcusable.  Cocom's decision to file proceedings for her daughter's return to Belize does not justify Timofeev reneging on his promise to pursue a visa for her to come to the United States, if that really had been the arrangement as he testified.

Under the Convention, the court must consider all of the "conditions" of consent.  Here, the court finds that a crucial condition of Cocom's alleged consent was violated and should be remedied.  The court's decision is also motivated by the reality that, by

bringing the Child to the United States but not fulfilling his promise to also bring Cocom, he has essentially deprived Cocom from seeing the Child for the remainder of her childhood.  Cocom, who is proceeding in this court in forma pauperis with pro bono counsel, is not financially capable of making frequent visits to the United States to visit her child.[8]  Without making a determination regarding which of the parties' factual narratives are accurate, the court finds that, even if it relied on Timofeev's version of events, Timofeev violated the condition of Cocom's consent, which renders the consent invalid.

Thus, the court finds that the Child has been wrongfully detained in the United States in violation of the Convention and **GRANTS** Cocom's Petition, ECF No. 1.  The court **ORDERS** the following:

(1) Timofeev is to immediately return the Child to Cocom in Belize to allow the authorities there to make judicial determinations regarding custody of the Child.. The court will issue a separate and un-redacted order contemporaneously with this order including more details about the timing and logistics of that return.

(2) Timofeev is ordered to cooperate with Consular officials from the United States and Belize to the extent that his assistance is needed to obtain travel documents for the Child.

---

[8] And, as Cocom's expert testified at trial, she might have difficulty obtaining a tourist visa to the United States after the immigration authorities see that she is coming to visit her young child who has permanent residency in the United States; in other words, the expert testified that if Cocom applied for a tourist visa the immigration authorities would likely suspect that she was actually coming to the United States under the ruse of a tourist visa with the intent to stay permanently with her child.  Tr. 64:9–18.

(3) Respondents, or any others acting on their behalf or at their direction, shall not remove the Child from this court's jurisdiction absent further order of this court. They shall not relocate the residence of the Child.

(4) Failure of respondents to comply with this order will result in contempt proceedings.  <u>See</u> 18 U.S.C. § 401 (providing that a federal court "shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command").

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 2, 2018**
**Charleston, South Carolina**